## Showers v. Merchants National Bank.

*Banks and banking—Checks—Forged endorsement—Notice of forgery to bank—Refusal to surrender check—Fictitious payee.*

1. Where a check is made payable to the order of a particular person, firm or corporation, the bank of the maker's deposit may pay the amount of it only upon the duly authorized order of the payee named in the check; when this is done, the amount of the check is taken out of the maker's deposit.

2. If the bank disregards such rule of law and pays the amount of the check, it is obliged to pay the amount out of its own funds.

3. If the depositor notifies the bank that the endorsement was forged, but refuses to deliver the check to the bank, so that the bank may recover from its correspondent, the depositor by his own conduct loses his right to hold the bank liable for the loss.

4. The rule that a bank is liable to its depositor for paying a check on a forged endorsement applies where a check has been lost or stolen and the payee's name has afterwards been forged; but it does not protect the depositor who is in fault in issuing a check to a fictitious person.

Motion for judgment *non obstante veredicto* and *sur* motion for a new trial. C. P. Schuylkill Co., Nov. T., 1923, No. 463.

*A. D. Knittle* and *George H. Gerber*, for plaintiff.

*George M. Roads* and *John L. Stauffer*, for defendant.

KOCH, J., Oct. 17, 1927.—The plaintiff resides in the City of Pottsville. On Dec. 18, 1922, he was called upon by one A. B. Lamb and bought from him

as agent for one S. H. Lindsay 500 shares of stock in the Wenstone Rubber Products Company at $2 per share, par being $1 a share. In part payment the plaintiff made out his check for $500 on the defendant bank, payable to the order of "Wenstone Rubber Co.," and handed the check to said A. B. Lamb as agent for Lindsay. On Dec. 28, 1922, the plaintiff negotiated to buy 1000 more shares of said stock and drew his check on said bank for $700 in part payment thereof, making his check payable to the order of "Wenstone Rubber Co., E. E. Wendell, Jr., Sec. & Treas.," and handed the check to a man whose name he is unable to recall.

The Wenstone Rubber Products Company is a Delaware corporation with an office in Chicago, Illinois, and another office in Chippewa Falls, Wisconsin.

Both of said checks were put in process of collection by being first deposited in one or more Philadelphia banks, the first check being endorsed "Wenstone Rubber Co., S. H. Lindsay," and the second being endorsed "Wenstone Rubber Co., S. H. Linsay" and "J. D. Kline." Showers had carried on his negotiations at different times for the purchase of the stock with S. H. Lindsay, A. B. Lamb, J. D. Kline and another man. Showers had his bank book balanced on Jan. 9, 1923, and when he examined the second of said checks he saw that the endorsement was not in the handwriting of E. E. Wendell, and concluded that the endorsement on each of the checks was a forgery. The endorsement on the second check was surely not made in the name of the payee on the check. Showers personally notified a clerk in the bank within several days that he would "never stand for that endorsement on those checks," and said, "I am going to hold you responsible for the endorsements on the checks because they are not properly endorsed." But, notwithstanding these facts, he drew a check for $300 on Jan. 22, 1922, in favor of S. H. Lindsay and handed it to him personally in Philadelphia, and drew two additional checks on Feb. 1, 1923, the one for $500, payable to the order of "S. H. Lindsay, Wenstone Rubber Co.," and the other for $1000, payable to the order of "S. H. Lindsay, Wenstone Rubber Co.," and mailed them to Lindsay at his office in Philadelphia. Showers had his bank book balanced again about Feb. 13, 1923, and found these last two checks charged against his account. These checks had also been put in process of collection by being first deposited in Philadelphia banks, both having been endorsed "S. H. Lindsay" and " J. D. Kline." When Showers examined these last two checks, he concluded that the endorsements thereon were also forged, and he notified the defendant bank of the fact between the 13th and 18th of February, 1923. He has never received any of said stock. His attitude in notifying the bank and making his demand on it appears in the following excerpts from his testimony: "Q. State whether you demanded a return of this from the bank? A. I demanded it personally, yes; not the first time, see; I demanded it the second time, as soon as I got the checks out, demanded the money. And they says to me, 'Fetch the checks in and give them to us and we will get your money back at the Philadelphia bank.' I says, 'I have got no money in a Philadelphia bank. Here is where I have my money deposited; but if you give me security for these checks, I will give you these checks.' And they never gave me security; at least they says to me, 'Fetch them in and we will give you security.' And I fetched the checks and took them in to them, and they says and I says, 'I got these checks here now. Have you got the security?' And they says, 'What security do you want?' And I said, 'Count the $2700 out, and that is my security.' And they says, 'We can't do that.' Well, I says, 'Then I guess we will have to sue for the money, if we can't get it any other way.'" Showers had all the checks with him when this con-

versation was had. Quoting from him again, he testified: "Mr. Marshall (that was the cashier of the bank) said, 'Will you let me see them?' I says, 'You can look at them, but I will hold them in my hands.' I says, 'You will never get them in your hands; I will hold them myself. But you can look at them, but I will hold them in my hands.' Q. What else, if anything, was said? A. That was all. After he looked at them, I walked out. Q. And you wouldn't give them to him to hold in his hand? A. Oh, no. Q. You held—? A. Sure, I held them in my own hands. If I give them to them, I never see them any more. When they get them, they give me security for them checks, when I give them checks over. But they never offered security to me for them. Q. Did you say you demanded security for them, or what was that? A. I give them plenty of time for to bring me——. Q. No; what you said, not what you tried to do? A. I didn't ask them for no security at all that time. That was done. And I says I walked out the bank, didn't I? Q. Didn't ask for any security at that time, but you walked out of the—? A. Before I——. Q. Answer the question? The Court: He said he didn't. A. They didn't ask for the checks; they only asked for to see the checks. Q. Why did you make that statement that they didn't ask for the checks? What made you make that statement? A. Because they didn't ask for the checks. Furthermore, they wouldn't have got the checks till they give me security for the checks. Q. Why did you refuse to give them—? A. What? Q. Why did you refuse to give them and say you would hold them in your hands? A. Oh, because I never give anything out of my hands without any security for it, when it comes down to money. . . . Q. What was it you told us in chief in regard to the demand you made on the bank to give you security before you delivered them the checks? A. I didn't. They were the ones asked me if I would fetch the checks in and they would give me security. I said, 'All right, I will fetch the checks in.'" That was right before this suit was brought. Showers continued his account in the bank, and further testified that every time he went to the bank to make a deposit, they were always talking about why didn't he fetch the checks in. Quoting further: "Mr. Marshall says to me, 'You work in conjunction with us and give us your checks and work with us, and we will get your money out of the Philadelphia bank.' I says, 'I got no money in a Philadelphia bank. Here is the bank I got my money in; I got my money in the Merchants National Bank, not in a Philadelphia bank.' Q. You would not do what he asked you to do? A. What! Give him my checks? Without security? I ain't got no horns on yet. They never offered me security for them." Again: "I told him (Mr. Marshall) I wouldn't give them without security. And then they says, 'Fetch them in and we will give you security.' And they asked me, 'What do you want for security?' I says, 'Count me $2700 out; that is the only security I will take for my checks.' And they refused."

The jury found in favor of the plaintiff, but allowed no interest. So the plaintiff made a motion for a new trial in order to recover interest on the claim, and the defendant made a motion for judgment *non obstante veredicto*, basing the motion upon the defendant's last two points, which were reserved, as follows:

"5. Plaintiff having testified that he refused to deliver to the defendant bank the checks in suit, which prevented the bank from collecting their respective amounts from its corresponding banks which had guaranteed the endorsements thereon, the verdict must be for the defendant.

"6. Under all the evidence in the case, the verdict must be for the defendant."

The banks through which the checks had gone had guaranteed the endorsements. The evidence clearly shows that the endorsements made by the original depositors of the checks were unauthorized or forged, and the question arises whether the plaintiff, by refusing to give the checks to the defendant bank, has not precluded himself from recovery in this case.

Where a check is made payable to the order of a particular person, firm or corporation, the bank of the maker's deposit may pay the amount of it only upon the duly authorized order of the payee named in the check. When that is done, the amount of the check is taken out of the drawer's deposit. If a bank disregards this rule of law and pays the amount of the check, it is obliged to pay the amount out of its own funds: McNeely Co. v. Bank of North America, 221 Pa. 588, 593; Land Title and Trust Co. v. Bank, 196 Pa. 230, 234; Califf v. First National Bank of Towanda, 37 Pa. Superior Ct. 412. Therefore, Showers's account could not be charged with the four checks in suit, totaling $2700. As soon as Showers discovered the forgery, it was his duty not only to make the facts known promptly to the bank, but he was also required to hand the checks over to the bank, because the bank had paid them out of its own funds, and thereby had acquired title to them, and it should have been put in a position to secure itself against the loss of that money. Without the checks, it was at a loss to proceed. Had Showers tendered the checks over to the bank and had he then drawn a check to the bearer for the $2700 and presented it for payment, the bank would have been obliged to honor the check or to stand for the consequences of the dishonor.

In Roth v. Crissy, 30 Pa. 145, it was held that the depositor was bound to return or tender a forged promissory note before bringing suit. Rick v. Kelly, 30 Pa. 527, 529, 530, is to the same effect. In the latter case the Supreme Court said: ". . . to the defendant, possession was vital, for his right of action against the maker or some other vendor was perfect. To permit the plaintiffs to keep both verdict and note would be manifestly unjust. If not entitled to a tender before suit, the defendant has no right to its return afterwards, and to send him on a circuitous chase after it, while genuine parties are daily growing weaker, is not to be thought of, unless some stubborn principle of law demands it. . . . In respect to counterfeit bank notes, it is everywhere conceded that return must be made promptly. . . ." See, also, Raymond v. Baar, 13 S. & R. 319, and Ritchie v. Summers and Coates, 3 Yeates, 531, 543. "The depositor should return the forged check at the time of notifying the bank of the forgery. It has been held that mere notice to a bank that it has paid a forged check while a depositor holds the check to investigate the crime will release the bank from all liability for having cashed the spurious check:" The Law of Bank Checks, by Brady, 222.

In Iron City National Bank v. Fort Pitt National Bank, 159 Pa. 46, 51, which was an action of assumpsit on a forged check, Mr. Justice Mitchell, speaking for the Supreme Court, said: "It is always a good defense that the loss complained of was the result of the complainant's own fault or neglect, and it would require a statute in very explicit terms to do away with so universal a rule of law, founded on so incontestible a principle of justice."

It may be said that the checks having been made payable to "Wenstone Rubber Company" were made to a fictitious party, and, therefore, payable to bearer, because the name of the company is in fact "Wenstone Rubber Products Company," as shown by the depositions of Harold B. Wendell, President of the company, and which were read into the evidence at the trial of this case: Act of May 16, 1901, § 9, cl. 3, P. L. 194, 196.

Showers v. Merchants National Bank.

"The rule that a bank is liable to its depositor for paying a check on a forged endorsement applies where a check has been lost or stolen and the payee's name has afterwards been forged; but it does not protect a depositor who is in fault, as in intrusting a check to one who he has reason to suppose will make a fraudulent use of it, or in so carelessly filling up a check that it may readily be altered, or in issuing a check to a fictitious person. It is confined to cases in which the depositor has done nothing to increase the risk of the bank:" Snyder v. Corn Exchange Bank, 221 Pa. 599; Land Title and Trust Co. v. Bank, 196 Pa. 230, 234. This would appear to apply to the last two checks, at least, because the plaintiff sent those to Lindsay even after he claimed that Lindsay had forged the first two checks. He was manifestly careless in doing that and may be charged with the most unreasonable negligence, as was said in Raymond v. Baar, 13 S. & R. 318, 319.

Upon all the evidence in the case, the verdict of the jury should have been rendered in the defendant's favor.

The motion for a new trial is overruled, the judgment on the verdict is arrested and judgment is entered in favor of the defendant upon payment of the jury fee.

From M. M. Burke, Shenandoah, Pa.